**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Town of Fairlee, Plaintiff,

v.                                                    }
                                                     }
                                                     }    Docket Nos. 114-7-01 Vtec &
Amy L. Record, Defendant                            }    167-10-01 Vtec
                                                     }
&                                                    }

In re: Appeal of  Amy L. Record

## Decision and Order on Motions for Summary Judgment

In Docket No. 114-7-01 Vtec, the Town of Fairlee brought an enforcement action against Amy L. Record. In Docket No. 167-10-01, Ms. Record appealed from a September 14, 2001 decision of the Zoning Board of Adjustment (ZBA) affirming a decision of the zoning administrator that the proposed use of the property after July 15, 2001 did not qualify as an A agricultural use.@ Defendant-Appellant Amy L. Record is represented by Colin W. Robinson, Esq.; the Town is represented by Andrea L. Gallitano, Esq. Interested persons Christopher Wren, Harold St. Peter, Mary K. Harris, Donald Newton, Joyce Newton, and Pam Oppenheimer have filed notices of appearance representing themselves in Docket No. 167-10-01 Vtec only.

The Town and Defendant-Appellant have moved for summary judgment; the unrepresented interested parties have not participated in the pending motions. The following facts are undisputed unless otherwise noted.

Ms. Record owns a 100-acre parcel of land located off Terry Hill on Bracket Road, entirely within a Residential zoning district. One- and two- family dwellings, accessory structures and uses, and agricultural structures and uses are the only permitted uses allowed in the Residential district. Multiple-family dwellings; gift shops/crafts shops; home occupations; soil, sand, and gravel excavation; hotels/motels; and commercial seasonal campsites/grounds are the only conditional uses allowed in the Residential district. ' 3.4(B) of the Zoning Regulations.

Sometime in 1998 Defendant-Appellant enclosed the entire property with an eight-foot-high woven wire fence. A building now called the A lodge@ was constructed on the property in 1998 under a building permit to construct a > camp.= The lodge building has two bathrooms and three bedrooms, and is capable of housing up to twelve people. The septic system for the building was installed in 1999 without a septic permit. A separate 24' x 36' butcher shop building was built and a separate septic system for it was installed in 2000 without zoning or site plan approval or building or septic permits. From approximately mid-1998 through at least July 15, 2001, Defendant-Appellant operated on the property the A Recordridge Hunting Preserve,@ including the sale of the opportunity to hunt on the property certain animals not native to Vermont, the sale of guide services, the sale of overnight lodging and meals in the lodge building[1], and the sale of butchering services. Defendant-Appellant advertised the Recordridge Hunting Preserve in magazines and with a brochure and price list. The brochure stated that hunters will be provided lodging, guides, meals, and hunting, all A included in the price of your hunt.@ The price was differentiated by the size and type of animal to be hunted. On-site butchering services incurred an

additional fee. Mr. Hill usually accompanies the hunters on the property, but 95% of the time the hunters succeed in killing the chosen animal without Mr. Hill= s assistance.

The price list and brochure listed or showed that the following types of animals were located on the property for hunting purposes: Russian boar, Mouflon sheep, North African Aoudad sheep, Corsican sheep, Hawaiian sheep, Texas Dall sheep, European fallow deer, Sika deer, New Zealand red deer, Spanish goats, and American buffalo. Some or all of these types of animals remain on the property to the present. None of the listed types of animals located on the property receive any veterinary services, nor are they registered or tagged. They are not tame and do not allow humans to approach. Appellant-Defendant does not provide shelter for the animals, and has not stated[2] that she provides any food for the animals, even in the winter months. The animals are not inoculated or treated for any animal diseases. The red deer and fallow deer are not tuberculin tested as required by 6 V.S.A. ' 1155. If they breed[3] on the property, they breed naturally and without the provision of any shelter or veterinary assistance, and newborns are not tagged. As of September of 2001, the only certificates of veterinary inspection or importation licenses for these animals were the importation of 13 fallow deer into Vermont in the fall of 1994.

On March 15, 2000, the Zoning Administrator sent a letter to Ms. Record indicating that he had been informed that she was operating or planning to operate A a hunting preserve which would be stocked with various wild animals, and for a fee people could enter the preserve in hopes of shooting one or more of the animals.@ The letter warned her that such a use is commercial in nature and would require site plan approval and conditional use approval before it could be allowed in the Residential zoning district, and laid out the regulation sections and the use categories that might apply to the proposal. The letter asked her to contact the Zoning Administrator as soon as possible to discuss her plans and the permit process. Discussion among the Zoning Administrator, Ms. Record and Mr. Hill disclosed their disagreement over whether the use on the property fell within the use category of A agricultural@ as opposed to A commercial.@

fter that discussion, the Zoning Administrator sent a second letter to Ms. Record, dated May 29, 2000. The letter stated that he A perceived [the project] to be a hunting preserve,@ and believed it to be a A commercial activity@ which would require site plan review and a conditional use permit.@ The letter also stated that if Ms. Record disagreed with that interpretation of the regulations, then she had the right to appeal that determination. She did not appeal the Zoning Administrator= s May 29, 2000 letter; it became final and cannot now be challenged.

She did, however, file an application for a conditional use and site plan review on August 2, 2000; the completed application was filed on August 17, 2000. The application materials described the present use as A camp, deer farm@ and the proposed use as A raise & market animals.@ The Planning Commission, describing the use contemplated as a > hunting preserve= , denied the site plan application in a decision dated September 6, 2000. Ms. Record initially appealed that decision to Environmental Court, but voluntarily dismissed the appeal. See In re Appeal of Record, Docket No. 277-12-00 Vtec. Accordingly, the September 6, 2000 decision of the Planning Commission became final and cannot now be challenged.

The Town sent a notice of violation dated April 5, 2001 to Defendant-Appellant, signed both by the Zoning Administrator and by the Health Officer, directing her to cease and desist from several continuing violations of the Town= s zoning regulations and health regulations, including specifically the lack of a permit for the sewage system for the lodge; the construction of an 8' by 16' shed without a permit; the construction of the butcher shop without a permit; the lack of permit for the sewage system for the butcher shop; and the lack of a permit for the butcher shop A as a commercial establishment@ to sell services and products to the public. The letter warned that the Town will seek all available remedies, including fines, if Ms. Record does not bring the property into compliance within seven days. The April 5, 2001 notice of violation was not appealed and therefore became final and cannot now be challenged.

On April 9, 2001, Ms. Record applied to the Town for as-built approval for the construction of the butcher shop and the storage shed. At this time, the appeal of the site plan in the Environmental Court was still pending, and the Zoning Administrator responded to the application by letter dated May 3, 2001 to Ms. Record and Mr. Hill, suggesting that any decision on the building permit application should be held in abeyance until the issuance of the Environmental Court decision regarding the site plan, and including signature blocks for Ms. Record and the Zoning Administrator to enter into this agreement. The Zoning Administrator spoke to Ms. Record regarding this request; she stated that she would consult with her attorney. The Zoning Administrator spoke to Attorney Robinson regarding this request; Attorney Robinson stated that Ms. Record would consider the request. Neither responded to the Zoning Administrator thereafter, until the Zoning Administrator sent a second letter dated June 11, 2001 describing this sequence of events and stating that if he did not receive her signature to the agreement by June 18, 2001 that he would assume that she had decided not to sign it. Neither Ms. Record nor Attorney Robinson responded to this letter. On June 25, 2001, therefore, the Zoning Administrator issued a written decision denying the April 9, 2001 application, on the basis that the buildings were part of the commercial hunting preserve for which no permits had been obtained. Defendant-Appellant did not appeal the Zoning Administrator=s June 25, 2001 decision; it became final and cannot now be challenged.

A second notice of violation dated July 18, 2001 was sent to Ms. Record requesting that she cease and desist from continuing to violate the Town=s zoning regulations by conducting commercial activity on the property. The commercial activity specifically cited in the letter includes: 1) operation of a hunting preserve; 2) operation of a lodge to house hunters; 3) operation of a slaughterhouse; 4) construction of the fence to enclose the animals for hunting; and 5) charging fees to hunters for the hunt, the housing, and for butcher services. The letter warns that the Town will seek all available remedies, including fines, if Ms. Record does not bring the property into compliance within seven days. Defendant-Appellant did not appeal the July 18, 2001 Notice of Violation; it became final and cannot now be challenged.

In a letter also dated July 18, 2001, Defendant-Appellant admitted the facts contained in findings 3, 4, 5, 6, 8, and 9 of the Planning Commission=s September 6, 2000 site plan decision as follows:

Defendant-Appellant and her partner Steve Hill have taken steps to develop her property as a hunting preserve. A camp built in 1998 has been converted to a hunting lodge which can accommodate up to nine hunters. During 1999 the perimeter of the property was fenced with 8-foot woven wire material which has been partially buried. At some point during 2000 a butcher shop was constructed to process wild game killed at the preserve. Mr. Hill stated that the fenced area is stocked with approximately 100 animals including 50 deer of various varieties and 35-45 adult boars. The brochure states that the fenced area also contains Spanish goats, buffalo and several types of sheep. The preserve is open for business six months of the year: three months in the spring and three months in the fall. Hunters arrive primarily on the weekend. Mr. Hill stated that clients of the preserve are not required to have a hunting license, or to have taken a hunter safety course. Mr. Hill takes them to an on-site target range to practice. Hunting rifles and bow and arrow are used at the preserve. The hunters are told to stay at designated stands. A butchering service is provided on site. A renderer picks up the offal once per week. Defendant-Appellant stated that the traffic generated by the hunting preserve would be minimal, or approximately 6 additional cars on weekends.

In the July 18, 2001 letter, Defendant-Appellant instead proposed, on and after July 16, 2001, to A keep, raise and propagate within a fenced enclosure certain domestic animals as defined in 6 V.S.A. ' 1151(2), specifically sheep, goats, fallow deer, red deer, American bison, and swine,@ and to maintain in effect importation and propagation licenses from the Department of Agriculture for the animals. The animals would be sold A on the hoof@ to buyers who will then be permitted to remove the living animal from the property. Buyers who wish to kill the animal on the property >

by any legal means= or to stay overnight at the property, would be A given@ a 3 to 4-day A time-share interest in the premises.@ Guide services and on-site butchering would no longer be offered, and the operation would no longer be advertised as a hunting preserve. Defendant-Appellant requested a determination from the Zoning Administrator that the new proposal use is allowed in the Residential zoning district as a permitted agricultural use that does not require further permitting.

The Zoning Administrator responded by letter dated July 25, 2001, that the proposed new use remained a commercial use, for two reasons. First, the proposed new use constituted the > hunting of wild animals,= and not > agriculture,= because the confining of even the listed animals for the purpose of hunting defines them as a A wild animal@ regulated by the Department of Fish and Wildlife and not as a A domesticated@ animal regulated by the Department of Agriculture, citing a 1999 amendment to 6 V.S.A. ' 1151(2). Second, the Zoning Administrator found that the provision of the A time-share@ interests in the property is for the purpose of providing temporary shelter, including the A amenity@ of hunting in the enclosed premises, which meets the definition of commercial under the Zoning Regulations. Defendant-Appellant appealed this decision to the ZBA, which affirmed it; she appealed the ZBA decision to this Court in Docket No. 167-10-01 Vtec.

Summary Judgment on the enforcement complaint up to and including July 15, 2001

Defendant-Appellant did not appeal the Zoning Administrator= s May 29, 2000 letter defining the operation as of that date as > commercial= under the zoning regulations, and therefore Defendant-Appellant cannot now contest that it did fall within the definition of a > commercial= use for which no permit had been obtained. Furthermore, Defendant-Appellant did not appeal the two Notices of Violation issued in April and July of 2001, and cannot now contest the existence of the violations described in those notices of violation. She also conceded the facts contained in the Planning Commission= s findings, which establish that the use at least through July 15, 2001 was a commercial use as a hunting preserve also providing lodging and meals and guide and butchering services for a fee. Summary Judgment is therefore GRANTED to the Town on the existence of the violations claimed in the amended complaint, applicable to activities up to and including July 15, 2001.

For the activities after July 15, 2001, material facts are in dispute as to what activities were being carried on after that date. The Town agreed with the undisputed fact that as of November 2001 the Town had not inspected the premises since July 15, 2001. Therefore summary judgment is DENIED to both parties as to whether any violations continued as of and after July 16, 2001. We will hold a telephone conference on March 1, 2002, to schedule an evidentiary hearing on the existence of violations after July 15, 2001, and on any appropriate remedy and penalties for violations both before and after July 15, 2001.

Deemed approval of the as-built permits for the shed and the butcher shop

On April 9, 2001, Defendant-Appellant applied for the approval of two structures at issue in these cases: the 24' x 36' A butcher shop and trap shed@ and a 8' x 16' storage shed. The Zoning Administrator had already ruled that the operation on Defendant-Appellant= s property was commercial and that it required site plan approval, which rulings were not appealed and had become final in 2000. Defendant-Appellant= s appeal of the Planning Commission= s denial of site plan approval due to the commercial nature of the operation was at that time still pending before the Court. Before the expiration of the time for ruling on such an application, the Zoning Administrator wrote to Defendant-Appellant and called her and her lawyer to suggest saving both parties unnecessary additional litigation by postponing decision on that application until the issue of the use category of Defendant-Appellant= s operation had been decided by the Court. As Defendant-Appellant did not respond, the Zoning Administrator wrote again about a month later

setting a deadline for Defendant-Appellant to agree to that approach. He issued his denial decision in writing promptly after the deadline had expired.

This sequence of events does not describe the sort of indecision and protracted deliberations on the part of the municipal decisionmaker for which the deemed approval remedy is reserved. The Vermont Supreme Court has clearly ruled that the deemed approval remedy is strictly construed to accomplish the statutory purpose, and that its application must always be balanced against the paramount obligation of the zoning system to protect the safety and general welfare of the public. Otherwise, the improper application of the deemed approval remedy would operate to grant a permit wholly at odds with the zoning ordinance, as it would in the present case. In re Appeal of Newton Enterprises, 167 Vt. 459, 465 (1998).

Moreover, Defendant-Appellant failed to appeal the Zoning Administrator= s July 25, 2001 decision on the April 9, 2001 applications, and therefore cannot now assert the deemed approval of those applications as a defense to this enforcement action. 24 V.S.A. ' 4472.

Piercing the agricultural veil

Defendant-Appellant argues that the operation of her property after July 15, 2001 falls within the use category of A agricultural use@ regardless of whether it was operated as a commercial hunting preserve prior to that date. We must examine the use of the property to determine whether it falls within the A agricultural@ use category. We will consider separately the raising or keeping of the animals confined on Defendant-Appellant= s property; the classification of the species of animals confined on the property; and the system under which Defendant-Appellant proposes to sell these animals to a buyer and to allow the buyer to hunt and capture or kill the selected animal, to remove it from the premises, and/or to use Mr. Hill= s services to butcher the animal on the property and to remove those portions of the butchered animal, such as the meat, skin, and/or trophy head, from the premises.

The Zoning Regulations define A agricultural use@ in terms of a greater than two-acre parcel of land used for an A agricultural purpose,@ which in turn is defined in full as:

agriculture, farming, dairying, pasturage, apiculture, horticulture, floriculture, viticulture, silviculture, and animal and poultry husbandry. The terms shall not include the slaughtering of animals or poultry for commercial purposes.

We first examine whether the operation as described to be carried on as of and after July 16, 2001 falls within this definition of agricultural purpose. It does not, because each of the terms in the definition carries a connotation of the human care and management of an animal or plant resource. Thus, the ownership of a parcel of forested land would not fall within the definition unless it were managed by people under the principles of silviculture, or the care of trees. The ownership of a parcel of land with wild grapes or wild bees on it would not fall within the definition, as opposed to a parcel on which grapes are cultivated and cared for to produce wine or a crop of grapes, or a parcel on which bees are maintained, sheltered and cared for to produce honey or for pollinating crops or both. Appellant-Defendant= s operation simply does not provide the > culture= component of A agriculture,@ nor the > husbandry= component of A animal husbandry.@ After the animals are brought onto the property, they are not > husbanded= or cared for in any way by the humans. They are not captured by Defendant-Appellant= s staff and handed over live to the buyer to be taken off the property to be kept by the buyer or slaughtered off premises; nor are they raised and killed on the property and handed over to the buyer as meat. They are not tame or accustomed to humans or to being cared for by humans, which is understandable as any such taming or domestication would obviate the purpose for which they are kept on the property: to provide an exciting hunting experience for the hunter or buyer of the animal.

Defendant-Appellant next argues that the listed species of animals necessarily fall within the definition of domestic animals under state statute. However, under those statutes, whether animals are classified as wild animals governed by the Commissioner of Fish and Wildlife or as domestic animals governed by the Commissioner of Agriculture depends not only upon the species of animal, but also upon the manner in which and the purpose for which they are kept.

For the protection of public health and the health of Vermont= s domesticated and wild animals, various statutes in Title 6 (Agriculture) and Title 10 (Conservation and Development) regulate the keeping of animals on property in Vermont. For purposes of Title 10, A wild animals or wildlife@ is defined as A all animals . . . other than domestic animals.@ 10 V.S.A. ' 4001(15). For purposes of control of contagious livestock diseases, in Title 6, the term A animal@ or A domestic animal@ is defined 6 V.S.A. ' 1151(2) (emphasis added) as:

cattle, sheep, goats, equines, fallow deer, red deer, reindeer, American bison, swine, poultry, pheasant, Chukar partridge, Coturnix quail, psittacine birds, ferrets, camelids, ratites (ostriches, rheas, and emus). The term shall include cultured trout propagated by commercial trout farms. However, an animal, including any of those listed in this subdivision, which is imported, possessed or confined for the purpose of hunting it, shall be a wild animal and regulated by the fish and wildlife board and commissioner of fish and wildlife under the provisions of part 4 of Title 10.

The references to fallow deer and red deer in ' 1151(2) must be read together with the specific definitions of those terms in ' ' 1151(11) and (12), which define both types of deer as domesticated deer of their respective species. Because the red deer and fallow deer on Appellant-Defendant= s property are not domesticated, they do not fall within the definition of domestic animal, even if the sheep, goats, buffalo or boars would fall within the definition.

Much more importantly, the animals enclosed on Appellant-Defendant= s property are confined there for the purpose of hunting them, regardless of whether the hunting operation is for the private enjoyment of Appellant-Defendant and her friends or whether it is a commercial hunting operation. Therefore, the animals are classified as wild animals. If they are propagated on the property, that propagation is governed by the fish and wildlife commissioner under 10 V.S.A. ' 5207. The shooting of such animals on the property may be governed by 10 V.S.A. ' 5217-5225, which requires a permit from the fish and wildlife commissioner to operate a regulated shooting ground. Animals released for the purpose in such regulated shooting grounds must be capable of caring for themselves in a wild state (' 5220) and persons hunting on such regulated shooting grounds must hold a hunting license or a one-day A shooting ground license.@ ' 5223. However, it would be the Commissioner of Fish and Wildlife in the first instance who would make any determination whether the propagation or hunting of non-native species of wild animals on Defendant-Appellant= s property is covered by the provisions of Title 10, not this Court in this case.

Even if the raising of the animals were for an A agricultural purpose@ under the Zoning Regulations, Defendant-Appellant= s system of sale of the animals to a buyer-hunter is nevertheless a commercial use of the property, rather than an agricultural one. The Zoning Regulations define the term A commercial@ in full as the A use of a building or land for the purchase, sale or exchange of goods and commodities, services, and amenities.@

Defendant-Appellant does not propose to sell a specific individual animal to a buyer who would take it off the premises to be kept or slaughtered elsewhere. Even if that were the proposal, it would only be considered an accessory use to an agricultural use if the raising of the animals itself were an agricultural use. However, what Defendant-Appellant is selling to the buyer-hunter is the right to engage in the hunt and to capture an animal. That is, the price paid by the buyer-hunter is paid not only in exchange for the animal itself as a commodity, but also for the > amenity= of hunting and capturing it, even if it will be taken alive off the premises.

If the hunter-buyer wishes either to stay overnight at the lodge or to kill the animal on the property, the price paid then also includes a 3- or 4-day A time-share interest in the premises.@ Defendant-Appellant appears to believe that if she > gives= the buyer-hunter a time-share interest in the property, the time-share interest will insulate the exchange from being considered commercial. The provision of such a property interest, even if it is properly done with registration in the land records and payment of transfer taxes and property taxes, does not insulate the transaction from being considered commercial. Defendant-Appellant is still selling to the buyer-hunter the right to engage in the hunt and to kill the animal, that is, to reduce it to the buyer-hunter= s possession and ownership. The price paid by the buyer-hunter in this instance is paid in exchange for the animal itself as a commodity, as well as for the > amenities= of hunting it, killing it, and butchering it on the premises, and for the > amenities= or > services= of lodging and meals in the lodge.

If the time-share interest were properly registered in the land records and the hunter-buyer paid the required pro-rata share of the property taxes, 32 V.S.A. ' 3619(b), it is possible that the hunter-buyer would enjoy a share in the constitutional right of all Vermonters to hunt on their own property, although the parties have not discussed and the Court has not researched whether that right applies to the hunting of non-native species not known in Vermont at the time of the adoption of the Vermont Constitution, or to those raised under 10 V.S.A. ' 5207. However, even that constitutional right would not transform the lodge from being considered a commercial use as a hotel or tourist home, just as a ski resort or hotel whose units are owned as time-share interests is still a commercial use.

Moreover, Defendant-Appellant cannot transform a commercial use into an agricultural or residential use by the creation of time-share interests in the property, if the sole purpose of the creation of the interests is to avoid the effect of the law. Legal alchemy of this sort must be rejected in this instance as it is in analogous situations of piercing the corporate veil or avoiding a fraudulent transfer of assets. For instance, where a A corporate shell is used merely as a sham to deprive [a] plaintiff of a remedy,@ the court may disregard the corporate form to correct the abuse. Winey v. Cutler, 165 Vt. 566, 567 (1996). Similarly, the court may A pierce the veil around the assets@ of a husband who A commingled his assets with those of his mother to hinder efforts of his spouse to obtain a fair property distribution.@ Nuse v. Nuse, 158 Vt. 637, 637 (1991) (citing Bassler v. Bassler, 156 Vt. 353, 363 (1991)).

Therefore, Defendant-Appellant= s operation as proposed after July 15, 2001 does not fall within the definition of agricultural use, is not a permitted use under the Zoning Regulations, and cannot be carried on on the property without a conditional use permit and site plan approval, if it falls within a conditional use category in the district. This decision makes no ruling as to whether it falls within any of the listed conditional uses for the district.

Accordingly, based on the foregoing, in Docket No. 114-7-01 Vtec, it is hereby ORDERED and ADJUDGED that the Town= s Motion for Summary Judgment is GRANTED and Defendant-Appellant= s Motion for Summary Judgment is DENIED as to the existence of the violations claimed in the amended complaint, applicable to activities up to and including July 15, 2001. For the activities after July 15, 2001, material facts are in dispute as to what activities were being carried on after that date, and therefore summary judgment is DENIED to both parties as to whether any violations continued as of and after July 16, 2001. Defendant-Appellant= s Motion for Summary Judgment is DENIED and the Town= s Motion for Summary Judgment is GRANTED as to permits to construct the butcher shop and the shed: they were not granted by deemed approval.

In Docket No. 167-10-01 Vtec, it is hereby ORDERED and ADJUDGED that the Town= s Motion for Summary Judgment is GRANTED and Defendant-Appellant= s Motion for Summary Judgment is DENIED: the operation as proposed after July 15, 2001 does not fall within the definition of agricultural use. This ruling concludes the appeal, Docket No. 167-10-01 Vtec, which

is hereby SEVERED from the enforcement case. This decision and order is a final judgment for the purposes of any further appeal of Docket No. 167-10-01 Vtec.

We will hold a telephone conference on March 1, 2002, in Docket No. 114-7-01 Vtec to schedule an evidentiary hearing on the existence of violations after July 15, 2001, and on any appropriate remedy and penalties for violations both before and after July 15, 2001. The hearing will be held at the courthouse in Chelsea, probably on April 5, 12 or 17, 2002; the parties should be prepared at the conference to discuss possible trial dates.

We note that the interested parties only entered their appearances in the appeal, Docket No. 167-10-01 Vtec, which was concluded by today= s decision, and that therefore they will not be called to participate in the conference in the enforcement case. They are free to telephone either attorney to discuss their possible participation in what remains of the enforcement case.

Done at Barre, Vermont, this 15th day of February, 2002.


_____
Merideth Wright
Environmental Judge

---

## Footnotes

[1]  The complaint does not cite as a violation of the lodge building's permit the provision of meals and lodging in the lodge building per se, although it appears that such a use would have required a conditional use permit regardless of the use of the property for hunting. We note that the lodge building received a zoning permit as a 'camp,' commonly understood to be a seasonal dwelling. One-family dwellings are permitted in the Residential district (whether seasonal or year-round) but "dwelling unit" is defined in Article VI of the Zoning Regulations specifically to exclude "motels, hotels, tourist homes, lodges, clubs, . . . or similar structures.

[2]  While it is possible that Appellant-Defendant provides some supplementary food sources for the animals, especially in the winter months, the Court finds it instructive that she has not come forward in support of her motion with any affidavits containing any customary indicia of domestication, such as the provision of food, shelter, or veterinary care.

[3]  Appellant-Defendant proposes as of and after July 16, 2001, to "keep, raise and propagate" the animals on her property. However, it is nowhere stated in the affidavits whether or how many of the animals on the property are females, or whether they were imported onto the property originally as breeding pairs, or whether and by how much the population on the property has increased since they were first imported.